AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

District of New Mexico

FILED

United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>30 Elk Drive, Chama, New Mexico 87520, including<br>garages, vehicles, and outbuildings, and the person<br>known as Rockne Gerard Earles | )<br>)<br>)<br>)<br>)<br>)   Case No. **23 MR 707** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ District of _____ New Mexico _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1512(c)(2); 111;<br>231; 371; 372; and 1752(a)(1)<br>& (2); 40 U.S.C. § 5104(e)(2) | Obstruction of Congress; assaulting a federal agent; civil disorders; conspiracy;<br>conspiracy to impede/assault federal agents; unlawful entry on restricted buildings<br>or grounds; violent entry, disorderly conduct, & other offenses on capitol grounds |

The application is based on these facts:

The affidavit of Special Agent Sarah Thaden is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Agent Sarah Thaden, FBI

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__ telephonically sworn and electronically signed __ *(specify reliable electronic means)*.

Date: ____ 04/05/2023 ____

*Judge's signature*

City and state:  Albuquerque, New Mexico

Karen B. Molzen, United States Magistrate Judge

*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br>**30 Elk Drive, Chama, New Mexico 87520,**<br>**including garages, vehicles, and outbuildings,**<br>**and the person known as Rockne Gerard**<br>**Earles** | **SW No. _____** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Sarah Thaden, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the person of ROCKNE GERARD EARLES ("the Subject" or "**EARLES**") and the premises known as 30 Elk Drive, Chama, New Mexico, to include garages, outbuildings, and vehicles located thereon, hereinafter the "**PREMISES**," further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI).  I have been so employed since March 2016. I have been assigned to the Minneapolis Division, Fargo, North Dakota Resident Agency since August 2020. Previously, I was assigned to the Washington Field Office, Northern Virginia Violent Crimes Task Force between August 2016 and August 2020. Prior to being hired as a Special Agent with the FBI, I was a police officer with the Charlottesville, Virginia Police Department and was so employed from July 2011 to February 2016. I have received formal training in the investigation of violent crimes, including specialized training in forensic evidence collection. I have received training regarding computer crimes and have participated in the execution of search warrants involving electronic evidence. In my duties

as a Special Agent, I investigate violent criminal activity and crimes against persons and property. Some of my responsibilities also include investigating Domestic Terrorism (which could include Racially Motivated Violent Extremism, Anti-Government Extremism, Anarchist Extremism, and Militia Extremism). Currently, I am tasked with, among other things, investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant.  It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of Title 18 U.S.C. Sections 1512(c)(2) (obstruction of Congress); 111 (assaulting a federal agent); 231 (civil disorders), 371 (conspiracy); 372 (conspiracy to impede or injure officer); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by **EARLES** and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as

2

others observed by the Subject.  There is also probable cause to search the PREMISES, further

described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

### Background – The U.S. Capitol on January 6, 2021

5.       U.S. Capitol Police (USCP), the FBI, and assisting law enforcement agencies are

investigating a riot and related offenses that occurred at the United States Capitol Building,

located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -

77.00906 on January 6, 2021.

6.       At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square

feet of ground, roughly four acres.  The building is 751 feet long (roughly 228 meters) from

north to south and 350 feet wide (106 meters) at its widest point.  The U.S. Capitol Visitor

Center is 580,000 square feet and is located underground on the east side of the Capitol.  On the

west side of the Capitol building is the West Front, which includes the inaugural stage

scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad

staircases, and multiple terraces at each floor.  On the East Front are three staircases, porticos on

both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a

concrete parkway.  All of this area was barricaded and off limits to the public on January 6,

2021.

7.       The U.S. Capitol is secured 24 hours a day by USCP.  Restrictions around the

U.S. Capitol include permanent and temporary security barriers and posts manned by USCP.

Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.      On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

9.      On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification").   The joint session began at approximately 1:00 p.m. Eastern Standard Time (EST).   Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection.   Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

10.      As the proceedings continued in both the House and the Senate, and with Vice President Mike Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.   As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

11.      At around 1:00 p.m. EST, known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

4

12.     At around 1:30 p.m. EST, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.  At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

15.     Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.  Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.

5



16.     Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down.  USCP ordered a similar lockdown in the House chamber.  As the subjects attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

17.     At approximately 2:30 p.m. EST, known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke

windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital.  The subjects also confronted and terrorized members of Congress, Congressional staff, and the media.  The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons.  At least one of the subjects carried a handgun with an extended magazine.  These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.    Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.    At around 2:45 p.m. EST, subjects broke into the office of House Speaker Nancy Pelosi.

20.    At around 2:47 p.m. EST, subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber.  Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?"  Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.    One subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "A Matter of Time Justice is Coming."



23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.   Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals are expected to be taken into custody.





24.     At around 2:48 p.m. EST, DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m. EST.

25.     At around 2:45 p.m. EST, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

26.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

27.     Between 3:25 and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all of the subjects.

28.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including

the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured.   The proceedings resumed at approximately 8:00 pm after the building had been secured.   Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

29.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

30.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

31.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

32.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

33.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021.  Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

34.     Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity.  It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging and stealing property.  As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

35.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot.  In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

1       https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





---

2    https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1.

### *Facts Specific to This Application*

36.     On January 16, 2021, the FBI National Threat Operations Center (NTOC) received an anonymous tip indicating that Rockne EARLES of North Dakota allegedly participated in the Capitol riots on January 6, 2021, and that EARLES posted information on his Facebook page about how to attend the event.  An anonymous tip included a hyperlink to EARLES' Facebook Page as part of the submission:

**Screenshot 1: Facebook Page**



37.     On February 19, 2021, the FBI NTOC received a second online tip stating that EARLES' Facebook account made a post on the Valley City, North Dakota "What's Happening"

---

³    https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-d80b0b96141e

16

Facebook page regarding travel to Washington D.C. on January 6, 2021. The tipster later provided a screenshot of the Facebook post:

**Screenshot 2: Facebook Post**



38.     The FBI performed a database check and inquired with local law enforcement, which both identified EARLES as a resident of Oriska, North Dakota.

39.     The FBI compared EARLES' North Dakota Driver's License photograph with surveillance video from the U.S. Capitol building and found a potential match of EARLES located inside the U.S. Capitol on January 6, 2021, in the Hall of Columns, near the south door. In the video, EARLES wore a black knit hat, chrome-colored goggles with a black strap, a black bandanna with a white pattern around his neck, a black leather jacket with zippered breast pocket, black gloves, a green shirt, and blue jeans:

17

**Screenshot 3: 0177 USCH 01 US Capitol Hall of Columns South Door**



40.     The U.S. Capitol surveillance video from January 6, 2021, titled

"0177_USCH_01_Hall_of_Columns_South_Door_-_2021-01-06_19h39min32s_1" was shown

to a local law enforcement official in North Dakota who worked in the county where EARLES

lived.  The law enforcement official knew EARLES from meetings and local events and was

familiar with what EARLES looked like.  The local law enforcement official recognized

EARLES in the U.S. Capitol surveillance video and positively identified EARLES in the video.

41.     According to legally obtained phone records, a cellular phone associated with

EARLES in the Accurint database, which ends in -8244, was identified as having utilized cell

sites consistent with travel from North Dakota to Washington, D.C. between January 3, 2021,

and January 6, 2021.

18

42.     These cell phone records further show that the cellular phone associated with EARLES, which ends in -8244, was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the U.S. Capitol building for approximately 19 minutes on January 6, 2021, during a timeframe between approximately 2:21 PM and 2:40 PM EST.

43.     The timeframe of the phone records is consistent with surveillance video obtained by the U.S. Capitol Police that shows the person identified as EARLES inside of the U.S. Capitol between approximately 2:17 PM and 2:44 PM EST on January 6, 2021.

44.     During the investigation, the FBI Washington Field Office (WFO) contacted the FBI's Fargo, North Dakota Resident Agency about EARLES and provided a video showing the individual identified as EARLES on the West Front of the U.S. Capitol.  In the video, EARLES grabs and throws a U.S. Capitol Police Officer (Victim Officer 1) against the Northwest stairs underneath the West Front scaffolding outside the U.S. Capitol Building during the January 6, 2021 riot. The video clip of the incident is publicly available at https://twitter.com/twfisher1/status/1369284471141380115) and at 17:10-17:15 in the video "Day of Rage: How Trump Supporters Took the U.S. Capitol, Visual Investigations" (https://www.youtube.com/watch?v=jWJVMoe7OY0).

45.     In the video, EARLES grabs and throws Victim Officer 1 to the ground using what appears to be a significant amount of force (Screenshots 4-9)  Two other rioters joined EARLES in shoving and assaulting Victim Officer 1 (Screenshot 7).  Victim Officer 1 landed on the steps and then attempted to escape away from the rioters (Screenshot 9).  Based on preceding

19

and subsequent events, this assault is believed to have occurred between approximately 1:50 p.m.

and 2:10 p.m. on January 6, 2021.

46.     In the video of the assault, EARLES is wearing the same unique clothing worn in

the U.S. Capitol surveillance video used for his identification: a black knit hat, chrome-colored

goggles with a black strap, a black bandanna with a white pattern around his neck, a black

leather jacket with zippered breast pocket, black gloves, a green shirt, and blue jeans.

**Screenshot 4 - https://twitter.com/twfisher1/status/1369284471141380115 - Potential
Original Source – RMG News**



**Screenshot 5   -   https://twitter.com/twfisher1/status/1369284471141380115   -   Potential Original Source – RMG News**



**Screenshot 6   -   https://twitter.com/twfisher1/status/1369284471141380115   -   Potential Original Source – RMG News**



**Screenshot 7   -   https://twitter.com/twfisher1/status/1369284471141380115   -   Potential Original Source – RMG News**



**Screenshot 8   -   https://twitter.com/twfisher1/status/1369284471141380115   -   Potential Original Source – RMG News**



**Screenshot 9 - https://twitter.com/twfisher1/status/1369284471141380115 - Potential Original Source – RMG News**



47.     Victim Officer 1 was identified and interviewed by the FBI on August 27, 2021, and May 3, 2022. Victim Officer 1 recalled being assaulted numerous times on January 6, 2021, including being struck with a flagpole by an unidentified male, being knocked to the ground by three men, and being hit in the head. As result of the riots on January 6, 2021, including this incident, Victim Officer 1 was concussed, treated for medical injuries at the hospital, and out of work for 45 days.

48.     Law enforcement reviewed numerous surveillance videos from the U.S. Capitol building which show EARLES physically inside the U.S. Capitol between approximately 2:17 PM and 2:44 PM EST on January 6, 2021.

23

49.     In these surveillance videos, and as depicted in the screenshots from these videos below, EARLES is wearing the same items worn during the assault of Victim Officer 1 underneath the West Front scaffolding outside the U.S. Capitol Building: a black knit hat, chrome-colored goggles with a black strap, a black bandanna with a white pattern around his neck, a black leather jacket with zippered breast pocket, black gloves, a green shirt, and blue jeans.

50.     Based on the surveillance video footage, EARLES appears to have remained in the U.S. Capitol building for approximately 27 minutes.

**2:17:39 PM EST, Senate Wing door near S139, entering U.S. Capitol Building**



**2:24:54 PM EST, Senate Wing door near S139**



**2:26:47 PM EST, near Supreme Court Chamber stairs**



**2:29:03 PM EST, Rotunda South**



26

**2:29:03 PM EST, Rotunda South**



**2:32:00 PM EST, Statuary Hall West**



**2:32:22 PM EST, Statuary Hall West Connector**



**2:43:13 PM EST, House Wing Door**



**2:41:00 PM EST, Memorial Door Interior**



**2:43:37 PM EST, Hall of Columns**



**2:44:03 PM EST, Hall of Columns South Door**



**2:44:11 PM EST, South Door Vestibule, exiting U.S. Capitol**



51.     I know, based on my training and experience, that people routinely re-wear clothing and accessories and store these items in their homes. Clothing and accessories consistent with those worn by **EARLES** on January 6, 2021 constitute evidence of the commission of the offenses discussed herein, in that **EARLES** can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire and accessories worn that day.   I also know, based on my training and experience, that cell phones are expensive, and people routinely retain their cell phones for many months or years. Through my training and

32

experience, I also know people routinely carry cell phones on their person for convenience and ease of access. For this reason, I believe there is probable cause to search **EARLES'** person.

52.     The **PREMISES** includes the residence located at 30 Elk Drive, Chama, New Mexico 87520, to include garages and outbuildings, and vehicles thereon, all of which are within the District of New Mexico.

53.     The **PREMISES** is the registered address for **ROCKNE GERARD EARLES** New Mexico Driver's License, and **EARLES** and his wife are associated with the **PREMISES** through databases available to law enforcement. Chama, New Mexico is a city within Rio Arriba County, NM. **EARLES** was formerly living in Barnes County, North Dakota, but relocated to Chama, New Mexico during the Summer of 2022.

54.     As described above, there is evidence that Subject had in his possession a digital device while at the U.S. Capitol on January 6, 2021.  In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

55.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that

33

same 2019 report estimated that 81% of Americans use at least one smartphone.  *See* Mobile

Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

56.     In addition, in my training and experience, it is common for individuals to back

up or preserve copies of digital media (such as photos and videos) across multiple devices to

prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices,

such as Apple devices and the Apple iCloud service.   Thus, there is reason to believe that

evidence of the offense that originally resided on the Subject's cell phone may also be saved to

other digital devices within the **PREMISES**.  Moreover, here, as widely reported in the news

media related to this matter, many individuals committing the Target Offenses kept and posted

videos, photos, and commentary about their participation in these offenses, essentially bragging

about their participation.  Based on that, there is also probable cause to believe that evidence

related to these offenses may have been transferred to and stored on digital devices beyond the

particular digital device the Subject possessed during the offenses.

57.     Based on my training and experience, and on conversations I have had with other

law enforcement officers, I know that some individuals who participate in activities aimed at

disrupting or interfering with governmental and/or law enforcement operations have been known

to use anonymizing services and/or applications capable of encrypting communications to

protect their identity and communications. By using such tools, in some cases, the only way to

see the content of these conversations is on the electronic device that had been used to send or

receive the communications.

34

58.     Further, based on my training and experience, and for all the reasons set forth herein, there is reason to believe digital devices, such as a cellular telephone, and clothing worn by **EARLES** on January 6, 2021 could be found either on his person or within the **PREMISES** and that these items constitute evidence related to criminal activities in which **EARLES** participated. There is also reason to believe that, when **EARLES** moved from his home in North Dakota to a new home in Chama, New Mexico in the Summer of 2022, he would have taken electronic devices, such as his cell phone, and his clothing with him to his new residence.

a.   In September 2022, investigators learned from a Barnes County, North Dakota law enforcement official that **EARLES** sold his home in Oriska, North Dakota and was believed to have moved to New Mexico.

b.   In October 2022, FBI personnel conducted law enforcement database searches and open-source research and discovered **EARLES** was associated with the **PREMISES**. Further, a search of New Mexico DMV records showed EARLES had obtained a New Mexico Driver's License issued on October 21, 2022 with the **PREMISES** listed as the Mailing Address.

c.   Open-source searches further indicated **EARLES'** former residence in Oriska, ND was for sale as of May 2022 and was sold on October 18, 2022. An open-source search of 30 Elk Drive, Chama, NM, indicated the **PREMISES** was sold on July 29, 2022.

d.   On November 14 and 15, 2022, local law enforcement conducted surveillance of the **PREMISES** located at 30 Elk Drive, Chama, NM, and

35

observed a silver Dodge pickup bearing a license plate number believed to be DAY433 and a silver/gold Honda sedan bearing license plate 693DNL parked at the residence. Photographs were taken of the property and the vehicles observed.

e.  Based upon review of the photographs taken of the property and vehicles, the color and pattern of the vehicle license plates match those of North Dakota. A search of North Dakota Department of Motor Vehicle (DMV) databases conducted by the FBI in November 2022 revealed **EARLES** was the registered owner of a 2014 silver Ram Truck with North Dakota license plates DAV433 and a 2008 Honda Civic with North Dakota license plates 693DNL.

f.  On March 28, 2023, law enforcement conducted updated searches through the New Mexico Department of Motor Vehicles and learned the 2014 silver Ram Truck, which was formerly registered in North Dakota, was now registered to a P.O. Box in Chama, New Mexico. The title date in New Mexico was March 27, 2023, and the vehicle was registered to **EARLES**.

g.  Cellular analysis conducted by the FBI in March 2023 of historical phone records and real time data obtained pursuant to a search warrant issued in the District of Columbia on March 2, 2023, are consistent with the cellular phone number which ends in -8244, being regularly located in the vicinity of the **PREMISES**, on many dates between January 1 and April 4, 2023. For

36

example, on April 4, 2023, at approximately 1509 hours Universal Coordinated Time (UTC), approximately 9:09am local time, precision location data provided by Verizon showed the device assigned the phone number ending in -8244 was located within a radius that was within 3,340 meters of the **PREMISES**. The data also showed the device appeared to be located within that area for several hours prior to this time. Further, analysis of the data provided by Verizon showed that the device assigned the phone number ending in -8244 was consistently located in the vicinity of the **PREMISES** during the nighttime hours. This is indicative of the user of the device using this location to sleep and would be consistent with the location being the primary residence of the user of the device.

h. The phone records indicated the subscriber of this phone number was **EARLES** and the account address as of March 2, 2023, was the same P.O. Box in Chama, New Mexico that was tied to **EARLES**' vehicle registration.

i. Additional analysis of these same records conducted by the FBI in March 2023 also showed that the cellular phone number associated with **EARLES**, which ends in -8244, utilized cell sites consistent with travel from New Mexico to North Dakota on or about March 6, 2023, and back to New Mexico on or about March 12, 2023. Analysis of these records between approximately March 13, 2023 and April 3, 2023, also indicated the cellular phone number associated with **EARLES** appears to have remained primarily

37

in New Mexico, with occasional short trips to southern Colorado and back to New Mexico, suggesting **EARLES** is now residing in New Mexico.

j.   In my training and experience, I know that individuals who possess electronic devices such as mobile phones, laptops, and tablets with internet capabilities often store those devices in their homes or vehicles, or on their person, for easy access and safe keeping. This is also true of clothing items. It is reasonable to believe that mobile devices and clothing belonging to **EARLES** could be found in the **PREMISES** or on the **SUBJECT'S PERSON** and that any electronic devices could contain evidence of the crimes under investigation.

59.   Your affiant also knows that hundreds of people have been arrested in connection with the riot that occurred at the U.S. Capitol on January 6, 2021.  During searches of the majority of those people's homes, from early 2021 through present, in multiple jurisdictions, law enforcement has recovered clothing, paraphernalia, tools, and devices that were worn, used, or carried on January 6, 2021.  For example, in mid-February 2022, the home of a defendant in the District of Massachusetts was searched.  During that search, law enforcement found the sweatshirt and backpack the defendant wore while committing crimes on January 6, 2021, at the U.S. Capitol.  Law enforcement also found a folder containing a D.C. metro transit fare card and receipt for the purchase of that card dated January 6, 2021.  In early March 2022, the home of a defendant in the Eastern District of New York was searched.  During that search, law enforcement found the hat, sunglasses, folding chair, and other objects the defendant

38

wore/carried while committing crimes on January 6, 2021, at the U.S. Capitol. During the first week of April 2022, the home of a defendant in the Middle District of Alabama was searched. Law enforcement found the clothing and gas mask the defendant wore/carried at the U.S. Capitol on January 6, 2021. In late May 2022, the residence of a defendant in the Southern District of Texas was searched, and law enforcement found the blue sweatshirt, black backpack, hat, gator, and tactical vest that the defendant wore on January 6, 2021. In early June 2022, the home of a defendant in the District of Columbia was searched, and law enforcement found a motorcycle jacket that the defendant wore at the U.S. Capitol on January 6, 2021. On June 29, 2022, the home and adjacent barn of a defendant in the District of Rhode Island was searched, and agents recovered two handheld radios consistent with the radio that the defendant was photographed holding in Washington, D.C. on January 6, 2021. On September 30, 2022, the residence of a defendant in the Western District of Pennsylvania was searched, and agents recovered a distinctive yellow mask that the defendant wore on January 6, 2021. On October 12, 2022, the homes of two suspected rioters were searched in the Western District of Washington. In one home, agents found a red "Make America Great Again" sweatshirt, a pair of black gloves, and a neck gaiter. In the other home, agents found a t-shirt with the words "In Trump we Trust" and neck gaiter. Both sets of clothing appeared to match the clothing worn by both individuals at the U.S. Capitol on January 6, 2021. On October 26, 2022, a search warrant was conducted in Burke, Virginia on a U.S. Capitol Riots subject. During the execution of the search warrant, multiple articles of clothing were located in the residence that the subject was seen wearing on January 6th. The subject's shirt, jacket, pants, and shoes were discovered in the residence. On

February 1, 2023, the homes of two suspected rioters were searched in the Eastern District of Michigan.  In one home, officers located clothing worn by the individual at the Capitol on January 6.  In the other home, agents discovered both clothing as well as the stick/club this individual took into the Capitol as well as a protest sign he displayed that day.

## TECHNICAL TERMS

60.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.     "Digital device," as used herein, includes the following three terms and their respective definitions:

1)     A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device.  *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information processing using a binary system to represent information.  Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)     "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices.  Examples of digital storage media include, but are not

limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking,

41

sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen.  Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives

42

signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.     "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data.   Data security devices may consist of hardware, software, or other programming code.   A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices.   Data security hardware may include encryption devices, chips, and circuit boards.   Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.   Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.     "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work.   Computer software is stored in electronic, magnetic, or other digital form.   It commonly includes programs to run operating systems, applications, and utilities.

g.     Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet.   An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32).   Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.   Most Internet service providers control a range of IP addresses.   Some computers have static—that is,

long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet.  ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports.  Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber.  By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

**COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS**

61.     As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on

the **PREMISES**, in whatever form they are found.  One form in which such items might be found is data stored on one or more digital devices.  Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B).  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

        a.    Individuals who engage in criminal activity, including the Target Offenses, use digital devices, like the Device(s), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include photographs, videos,

45

logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; and contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

b.       Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.       Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet.  Electronic files downloaded to a digital device can be stored for years at little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.  In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of

46

electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

62.    As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

a.    Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic

storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used.  Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords.  Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use.  Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created.  This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    b. Forensic evidence on a digital device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

48

c.      A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.      Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device.  For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

63.     Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today.  Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often requiring unique forensic tools, techniques, and expertise.  As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled

remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In

51

addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

   e. Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software.  The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device.  Additionally, most smart phones and other mobile devices require passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode.  Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer.  Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many.  For example, one such mobile application, "Hide It Pro,"

disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices.  In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

64.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a.      Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.      Upon securing the **PREMISES**, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and

transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the **PREMISES**.  The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2.      The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.      In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover

54

"deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B.  Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## CONCLUSION

65.    I submit that this affidavit supports probable cause for a warrant to search the **SUBJECT'S PERSON** and **PREMISES**, as described in Attachment A, and to seize the items described in Attachment B.

Respectfully submitted,

_____
Sarah L. Thaden
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically and signed electronically on April 5, 2023:

_____
KAREN B. MOLZEN
UNITED STATES MAGISTRATE JUDGE

55

## ATTACHMENT A

*Property to be searched*

The person to be searched is ROCKNE GERARD EARLES (date of birth 2/8/1961) as pictured below, provided that such person is located within the District of New Mexico:



The property to be searched is 30 Elk Drive, Chama, New Mexico 87520, (the "PREMISES") and any garages, vehicles, and outbuildings on the property, storage lockers (including safes) and electronic media, specifically wireless telephones, computers, and tablets, located thereon.

The subject residence is a single-family home located on an approximately 10-acre lot. The main home is a two-story residence with brown log siding and white trim. Also believed to be included on the property are various outbuildings including a steel barn, a two-car garage, and horse facilities. The property is pictured below from photographs taken by law enforcement officers on November 15, 2022:









## ATTACHMENT B

*Property to be seized*

1.      The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 1512(c)(2) (obstruction of Congress); 111 (assaulting a federal agent); 231 (civil disorders); 371 (conspiracy); 372 (conspiracy to impede/assault federal agents); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by **ROCKNE GERARD EARLES** ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

   a. Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

   b. Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

   c. Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

   d. Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

   e. Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

   f. Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

   g. Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.  Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.  Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.  Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.  Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.  Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.  Evidence of communication devices, including closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.  Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

o.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.      Records and information that constitute evidence of identity, including but not

limited to:

    a.  clothing worn by the subject, to include a black knit hat, chrome-colored goggles with a black strap, a black bandanna with a white pattern, a black leather jacket with zippered breast pocket, black gloves, a green shirt, blue jeans, and white tennis shoes, as pictured below:





3



    b.  clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

3.    Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

    a.  Any records and/or evidence revealing the Subject's presence at the January 6, 2021, riot;

    b.  Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

    c.  The Subject's (and others's) motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

    d.  The Subject's (and others's) activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

4.      Digital devices used in the commission of, or to facilitate, the above described offenses, including taking pictures and/or videos inside the Capitol Building while committing the Target Offenses.

5.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.  evidence of the times the Device(s) was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

5

During the execution of the search of the **PREMISES** and the person described in Attachment A, law enforcement personnel are also specifically authorized to obtain from **ROCKNE GERARD EARLES** (but not any other individuals present at the **PREMISES** at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

(a)     any of the Device(s) found at the **PREMISES**,

(b)     where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s).  Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information.  However, the voluntary disclosure of such information by the aforementioned

person(s) is permitted.  To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

7